MAGISTRATE JUDGE _Bowler_

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVERIO PUGLIESE, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SONUS NETWORKS, INC., HASSAN M. AHMED, and STEPHEN J. NILL,<br><br>Defendants. | Civil Action No.<br><br>**04   10612 DPW**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAW**<br><br>**JURY TRIAL DEMANDED** |

RECEIPT # _54905_
AMOUNT $ _150.00_
SUMMONS ISSUED _✓_
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _CMB_
DATE _3-30-04_

Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters based upon the investigation made by and through his attorneys, which investigation included, among other things, a review of the public documents and news releases of Sonus Networks, Inc., including its press releases and public filings with the U.S. Securities and Exchange Commission (the "SEC").

## NATURE OF THE ACTION

1.     Plaintiff brings this action as a class action on behalf of himself and all other persons who purchased the common stock of Sonus Networks, Inc. ("Sonus" or the "Company") during the period June 3, 2003 through and including February 11, 2004 (the "Class Period"), to recover damages caused by defendants' violation of the federal securities laws.

2.     Sonus purports to be a leading provider of packet voice infrastructure solutions for wireline and wireless service providers. The Company's products include media gateways, softswitches and network management systems, which are deployed in service provider networks worldwide.

3.     Throughout the Class Period, Sonus touted its strong financial performance and consecutive quarter-over-quarter revenue growth to the unsuspecting public. In reality, however, the Company's revenues and certain other financial statement accounts were misstated as a direct result of the Company's improper revenue recognition and certain other improper practices.

4.     On January 20, 2004, after the market closed, Sonus stunned the public when the Company issued a press release announcing that it would delay the release of its fourth quarter and year-end financial results for the fiscal year-ended December 31, 2003 because the Company needed more time to complete its year-end audit. The following day, the stock price declined $.98 per share, or 9.9%, to close at $8.93.

5.     Then, on February 11, 2004, after the market closed, Sonus further shocked investors when the Company issued a press release announcing a so-called "update" on the status of its fourth quarter and year-end 2003 financial results. As Bill Mann, an analyst for Motley Fool.com described, "[t]his isn't some 'reaffirming guidance' kind of communiqué – it was a bombshell."

6.     Indeed, the Company announced that, in connection with the year-end audit, its auditors had uncovered certain improper revenue recognition practices and other issues relating to both the timing of revenue recognized and other financial statement accounts. The Company further revealed that as a result of these improper practices, it

may have to restate at least its 2003 financial statements and possibly prior periods as well. The Company tried to soften the blow by reassuring investors that certain employees responsible for the improper conduct had been terminated.

7.    Upon the wake of this announcement, Sonus' common stock dropped $1.05, or 15% in extended trading that day. The following day, the stock continued to plummet, closing at $5.39 per share, down $1.30 per share, or 19.4% from the previous day's close. In total, the stock price has declined an astounding $2.11, or 28% since the February 11, 2004 Announcement, on volume of ninety-six million shares, nearly fifteen times that of the three-month average volume.

8.    Since the Company announced the delay of its fourth quarter and year-end 2003 earnings on January 20, 2004, it has shed 46% of its market capitalization, or $1.2 billion and its shares have fallen nearly 50%.

9.    Wall Street analysts were outraged by the Company's disclosure of its improper accounting practices. Goldman Sachs, Smith Barney and Legg Mason all downgraded the Company's rating within a day of the February 11, 2004 Announcement, citing the potential restatement as the primary reason. In addition, Bill Mann, an analyst for Motley Fool.com, commented "[f]or management to have missed such activity for an extended period of time is inexcusable. So while it may be great that it has identified and eliminated wrongdoers, this sounds like a much deeper problem."

## JURISDICTION AND VENUE

10.    The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

11.    The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the dissemination to the investing public of the misleading statements and omissions at issue, occurred in substantial part in this District. Moreover, Defendants conduct substantial business in this District.

13.    In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## PARTIES

14.    Plaintiff Saverio Pugliese purchased Sonus common stock during the Class Period as set forth on the attached certification and was damaged thereby.

15.    Defendant Sonus Networks, Inc. is a leading provider of packet voice infrastructure products and maintains its principal executive offices at 5 Carlisle Road, Westford, Massachusetts 01886.

16.    Defendant Hassan M. Ahmed ("Ahmed") served as Sonus' President and Chief Executive Officer at all relevant times. Defendant Ahmed made statements to investors in and approved Sonus' materially false and misleading press releases. Defendant Ahmed also signed the Company's quarterly reports on Form 10-Q filed with the SEC during the Class Period.

17.     Defendant Stephen J. Nill ("Nill") served as Sonus' Chief Financial Officer, Vice President of Finance and Administration and Treasurer at all relevant times. Defendant Nill approved Sonus' materially false and misleading press releases and signed the quarterly reports on Form 10-Q filed with the SEC during the Class Period.

18.     Defendants Ahmed and Nill are sometimes referred to herein as the Individual Defendants.

19.     By reason of their positions with the Company, the Individual Defendants had access to internal documents, reports and other information, including adverse non-public information concerning the Company's business and financial condition, and attended management and/or board of director meetings. As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

20.     Sonus and the Individual Defendants, as officers and directors of a publicly held company, had a duty to promptly disseminate truthful and accurate information with respect to and to promptly correct any public statements issued by or on behalf of the Company that had become false and misleading.

21.     Each defendant knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's common stock and would cause the price of the Company's common stock to become artificially inflated. Each of the defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

22.    Defendants are liable, jointly and severally, as direct participants in and co-conspirators of the wrongs complained of herein.

## CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased the common stock of Sonus during the period June 3, 2003 through and including February 11, 2004, and who suffered damages thereby. Excluded are the defendants, members of the defendants' families, any entity in which any defendant has a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the defendants (the "Class").

24.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to the plaintiff at this time and can only be ascertained through appropriate discovery, the plaintiff believes there are, at a minimum, hundreds of members of the Class who traded during the Class Period. Sonus had 244,451,558 shares of its common stock outstanding as of September 30, 2003. Throughout the Class Period, Sonus' common stock actively traded on the NASDAQ under the ticker symbol "SONS."

25.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether the Company issued false and misleading statements during the Class Period;

(c)     whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period;

(d)     whether defendants acted knowingly or recklessly in issuing false and misleading statements;

(e)     whether the market prices of Sonus' securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

26.     Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

27.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

28.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

29.    Sonus was founded in 1997. The Company's products are a new generation of carrier-class switching equipment and software that enables voice services to be delivered over packet-based networks. These packet-based networks transport traffic in small bundles ("packets"), thereby creating a more efficient and cost-effective means of providing communications services. By enabling voice traffic to be carried over packed-based networks, the Company's products will accelerate the convergence of voice and data into the new public network.

30.    Sonus' primary customers are communications service providers, including long distance carriers, local exchange carriers, Internet service providers, wireless operators, cable operators, international telephone companies and carriers that provide services to other carriers.

31.    Sonus sells its products primarily through direct sales forces. In some markets, however, the Company may also sell its products through distributors and resellers.

### B.    Pre-Class Period Statements

32.    On April 9, 2003, after the market closed, the Company issued a press release announcing Sonus' financial results for the first quarter ended Mach 31, 2003 (the "April 9th Press Release"), explicitly stating that its financial statements were prepared "in accordance with U.S. generally accepted accounting principles (GAAP)."

Specifically, the Company reported total revenue for the quarter of $16.0 million and a

net loss and loss per share of $4.4 million and $0.02 per share, respectively. In the April

9th Press Release, Defendant Ahmed boasted:

> Our financial results for the first quarter reflected good progress toward our
> business objectives. We grew our revenues 27 percent over last quarter, and by
> continuing to manage our business with precision, we further narrowed our net
> loss. In Q1, we also continued to add new customers around the globe and made
> important additions to our product family.

33.      As a result of Sonus' positive statements contained in the April 9th Press

Release, Sonus' common stock rose from a closing price on April 9, 2003 of $2.20 to

close at $2.72 on April 10, 2003, an increase of $0.52, or 23.6%.

34.      On April 22, 2003, the Company issued a press release announcing that it

had completed a public offering of twenty million shares of its common stock at a per

share price of $3.05, made under an effective registration statement filed with the SEC.

Defendant Ahmed was quoted as saying:

> Enhancing our financial strength has been an important component of our strategy
> as we seek to expand our partnerships with some of the world's largest service
> providers. The financial transaction announced today bolsters our balance sheet,
> and positions us to build on our success in providing the next-generation, carrier-
> class solutions that enable voice services to be delivered over packet-based
> networks.

35.      On May 9, 2003, the Company filed with the SEC its Quarterly Report on

Form 10-Q for the period ended March 31, 2003 (the "First Quarter 10-Q"). The First

Quarter 10-Q repeated the same materially false and misleading financial information

contained in the April 9th Press Release. In addition, the defendants represented that:

> The accompanying unaudited condensed consolidated financial statements have
> been prepared by Sonus and reflect all adjustments, consisting only of normal
> recurring adjustments that in the opinion of management are necessary for a fair
> statement of the results for the interim periods. The unaudited condensed
> consolidated financial statements have been prepared in accordance with the

regulations of the Securities and Exchange Commission (SEC) and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.

\*      \*      \*

*(e) Revenue Recognition*

Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

Defendants Ahmed and Nill signed the First Quarter 10-Q.

36.     The Class Period begins on June 3, 2003 when the price of Sonus shares closed at $5.11 per share.

**C.     Materially False And Misleading Statements Disseminated During The Class Period**

37.     On July 10, 2003, after market close, the Company issued a press release announcing Sonus' financial results for the second quarter and six months ended June 30, 2003 (the "July 10th Press Release") explicitly stating that its financial statements were prepared "in accordance with U.S. generally accepted accounting principles (GAAP)." Specifically, the Company reported total revenue for the second quarter and six months of $21.4 million and $37.4 million, respectively, a net loss of $3.2 million and $7.6 million, respectively, and a loss per share of $0.01 and $0.04 per share, respectively, for the same period.  In addition, Defendant Ahmed highlighted the Company's quarter-over-quarter revenue growth, stating:

We are pleased with the progress that we made in the second quarter, particularly with our 33% sequential revenue growth. We executed across all areas of the business broadening and strengthening our customer base, expanding our leading product offering, bolstering our balance sheet and advancing our drive to profitability.

*     *     *

Our revenue growth, coupled with premier customer wins like Verizon Communications underscores our belief that the packet voice market is entering a new phase. Incumbent carriers are now adopting packet voice solutions and Sonus Networks is proud to be at the forefront of this transition.

38.    As a result of Sonus' positive statements contained in the July 10th Press Release, Sonus' common stock soared from a closing price on July 10, 2003 of $5.72 to close at $7.10 on July 11, 2003, an increase of $1.38, or 24.1%.

39.    On August 14, 2003, Sonus filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2003 (the "Second Quarter 10Q"). The Second Quarter 10-Q repeated the same materially false and misleading financial information contained in the July 10th Press Release. In addition, the defendants represented that:

The accompanying unaudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments that in the opinion of management are necessary for a fair statement of the results for the interim periods. The unaudited condensed consolidated financial statements have been prepared in accordance with the regulations of the Securities and Exchange Commission (SEC), and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.

*     *     *

*(e) Revenue Recognition*
Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue

> from maintenance and support arrangements is recognized ratably over the term
> of the contract. Amounts collected prior to satisfying the revenue recognition
> criteria are reflected as deferred revenue. Warranty costs are estimated and
> recorded by Sonus at the time of product revenue recognition.

Defendants Ahmed and Nill signed the Second Quarter 10-Q.

40.    On September 23, 2003, the Company issued a press release announcing

that it had completed a public offering of seventeen million shares of its common stock at

a per share price of $7.75 less underwriter discounts, made under an effective registration

statement filed with the SEC.  Defendant Ahmed was quoted as saying:

> Strengthening our balance sheet has been an important objective for Sonus as we
> continue to develop relationships with some of the world's largest service
> providers.  The financial transaction announced today enhances our position as we
> enter the next phase of the migration from circuit to packet voice networks.

41.    On October 8, 2003, after the close of the market, the Company issued a

press release announcing Sonus' financial results for the third quarter and nine months

ended September 30, 2003 (the "October 8th Press Release") explicitly stating that its

financial statements were prepared "in accordance with U.S. generally accepted

accounting principles (GAAP)."  Specifically, the Company reported total revenue for the

third quarter and nine months of $28.6 million and $66.0 million, respectively.  The

Company also reported net income of $1.2 million and earnings per diluted share of

$0.01 for the third quarter and a net loss and loss per diluted share of $6.4 million and

$0.03, respectively, for the nine months.  In the October 8th Press Release, defendant

Ahmed commended the Company for attaining four quarters of consecutive growth:

> This was a strong quarter for Sonus Networks, our fourth consecutive quarter of
> revenue growth.  Our revenues grew 34% sequentially to $28.6 million, reflecting
> increased market demand for packet telephony and the expanding number of
> customers who have adopted Sonus' solutions.  We achieved an important
> milestone in reporting our first quarterly profit on a GAAP basis.  Additionally,
> we bolstered our balance sheet to capitalize on the opportunity ahead, adding

12

$126 million to our cash and marketable securities through a common stock offering in September.

42.    As a result of Sonus' positive statements contained in the October 8th Press Release, Sonus' common stock rose from a closing price on October 8, 2003 of $8.30 to close at $8.80 on October 9, 2003, an increase of $0.50, or 6%.

43.    On November 10, 2003, Sonus filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2003 (the "Third Quarter 10Q"). The Third Quarter 10-Q repeated the same materially false and misleading financial information contained in the October 8th Press Release. In addition, the defendants represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments that in the opinion of management are necessary for a fair statement of the results for the interim periods. The unaudited condensed consolidated financial statements have been prepared in accordance with the regulations of the Securities and Exchange Commission (SEC), and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.
>
> *        *        *
>
> **(d) Revenue Recognition**
> Sonus recognizes revenues from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenues when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenues are recognized as the services are provided. Revenues from maintenance and support arrangements are recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenues. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

Defendants Ahmed and Nill signed the Third Quarter 10-Q.

13

44.     During the Class Period, defendants mislead the investing public and artificially inflated the price of Sonus' common stock by publicly issuing materially false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. The statements identified in ¶¶ 37 through 43 above were each materially false and misleading when made because:

(a)     Defendants knowingly or recklessly artificially inflated the Company's revenues, net income/(loss) and earnings/(loss) per share by causing revenue to be recognized in violation of SOP 97-2 and Company policy;

(b)     Defendants knowingly or recklessly artificially inflated the Company's accounts receivable and total assets by recording revenue before it was earned;

(c)     Defendants knowingly or reckless understated the Company's deferred revenue and total liabilities by recording unearned revenue as earned;

(d)     The Company's financial statements were not prepared in accordance with GAAP and the Company's financial statements were not fair statements of results for the interim periods presented; and

(e)     Defendants knowingly or recklessly violated the Company's own internal revenue recognition policy.

## D.     The Truth Begins To Emerge

45.     On January 20, 2004, Sonus shocked investors when the Company announced that it would delay the release of fourth quarter and year-end financial results for the fiscal year-ended December 31, 2003, pending completion of the 2003 audit.

14

46.    Then, on February 11, 2004, after the market closed, Sonus further stunned investors when it announced that an internal review in connection with the Company's year-end audit identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts.

47.    The Company further disclosed that it was currently reassessing the proper periods in which revenue should be recognized for those transactions and that revenue or deferred revenue in periods previously reported could be affected as a result of this "reassessment." Meanwhile, the Company tried to reassure investors that the responsible employees had been terminated.

48.    Defendant Ahmed commented on the revelation:

We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting,

49.    The Company's stock plunged $2.11 per share, or 28% the day after this shocking revelation, to close at $5.39 per share, on trading volume nearly fifteen times that of the three-month average.

50.    In response to the Company's February 11th Announcement, several analysts downgraded the Company's rating. Among those analysts was Goldman Sachs, who downgraded the Company to "underperform," stating that "the uncertainty around the audit outweighs the health of the business." Similarly, both Smith Barney and Legg Mason cut Sonus' rating from "buy" to "hold."

## ADDITIONAL SCIENTER ALLEGATIONS

51.    As alleged herein, defendants acted with scienter in that defendants knew that the statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced to the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Sonus, their control over and/or their associations with the Company which made them privy to confidential proprietary information concerning Sonus, participated in the fraudulent scheme alleged herein.

52.    Defendants were further motivated to artificially inflate the Company's stock in order to complete two separate stock offerings and to allow for certain insiders to sell a significant amount of Company stock during the Class Period.

### Multiple Stock Offerings

53.    The first offering, consisting of 20 million shares of stock issued at $3.05 per share, was completed on April 22, 2003, with the Company reaping total proceeds of approximately $61.0 million. This offering occurred only two weeks after the Company announced strong financial results with a 26% increase in revenue quarter-over-quarter.

54.    The second offering, consisting of 17 million shares of stock issued at $7.75 per share, was completed on September 23, 2003, with the Company reaping total proceeds of approximately $126 million, net of underwriter discounts.

Insider Selling

55.    Numerous insiders also profited from the Company's artificially inflated stock price resulting from defendants' false and misleading statements, by engaging in improper insider selling.  Specifically, certain insiders reaped proceeds of more than $2 million from the sale of more than 250,000 shares of their own, personal stock, as illustrated in the chart below:

| Name | Position | No. of Shares | Proceeds |
|---|---|---|---|
| John M. O'Hara | Vice President | 13,750 | $489,000 |
| Paul R. Jones | Vice President | 55,000 | $381,000 |
| Edward Anderson | Vice President | 65,584 | $449,000 |
| Edward Harris | Vice President | 30,000 | $204,570 |
| **Total** | | **264,334** | **$2,000,070** |

## THE COMPANY'S GAAP VIOLATIONS

56.    The Company's false and misleading financial statements and press releases identified above were materially false and misleading when made.  The Company expects to restate its financial results during the Class Period because, contrary to its earlier statements, those results did not comply with GAAP.

57.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with

GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

58.     The Individual Defendants caused Sonus to falsify its reported financial results through its improper revenue recognition where Sonus prematurely booked revenues on certain transactions with customers.

59.     GAAP, as set forth in SOP 97-2, *Accounting for Software Revenue Recognition,* prohibits revenue recognition unless the following four criteria are met: (i) persuasive evidence of an arrangement exists; (ii) the product has been delivered; (iii) the vendor's fee is fixed or determinable; and (iv) it is probable that the revenue will be collected.

60.     Contrary to these representations and contrary to GAAP and SEC rules, during the Class Period, Sonus improperly recognized revenue that, according to the information Sonus had at the time the revenue was recognized, the Company had not earned. Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is

useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79);

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

(i)    The principle that a conservative approach be taken providing early recognition of unfavorable events and minimizing the amount of income reported.  (See Statement No. 4 of the Accounting Principles Board ("APB Nos.") at 4 ¶¶ 28, 35, 171);

(j)    The principle that the financial information presented should be complete. (See APB No. 4, ¶¶ 28, 35, 88, 171);

(k)    The principle of fair presentation ("presents fairly").  (See APB No. 4, ¶¶ 109, 138, 189);

(l)    The principle of adequacy and fairness of disclosure.  (See APB No. 4, ¶¶ 81, 106, 189, 199);

(m)    the principle of materiality concerning information that is significant enough to affect evaluations or decisions. (See APB No. 4, ¶¶ 25, 128);

(n)    the principle that the substance of transactions rather than form should be reflected. (See APB No. 4, ¶¶ 25, 35, 127);

(o)    the principle that the financial statements contain and disclose relevant, understandable, and timely information for the economic decisions of the user. (See APB No. 4, ¶¶ 23, 88, 89, 92);

(p)    the principle that the financial statements provide reliable financial information about the enterprise for the economic decisions of the user. (See APB No. 4, ¶¶ 77, 78, 107, 108); and

(q)    the principle that accounts receivable must be reported in the financial statements at net realizable value  (See, e.g., ARB-43, Chapter 3A; FASB No. 5, Accounting for Contingencies.)

61.    The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## FRAUD-ON-THE-MARKET PRESUMPTION

62.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

a)    Defendants made public misrepresentations or failed to disclose material facts regarding Sonus' business and financial condition during the Class Period;

b)    The omissions and misrepresentations were material;

c)    The Company's common stock traded on the NASDAQ, an efficient and open market;

d)    The misrepresentations and omissions alleged would tend to induce a
reasonable investor to misjudge the value of the Company's
common stock;

e)    Plaintiff and the members of the Class purchased Sonus' common stock
between the time defendants failed to disclose or misrepresented
material facts and the time the true facts were disclosed, without
knowledge of the misrepresented facts; and

f)    Sonus is followed by various analysts and news media. At all relevant
times, the price of Sonus' common stock reflected the effect of
news disseminated in the market.

63.    Based on the foregoing, Plaintiff and the members of the Class are entitled
to the presumption of reliance upon the integrity of the market.

## THE SAFE HARBOR PROVISION IS INAPPLICABLE

64.    The statutory safe harbor under the Private Securities Law Reform Act of
1995, which applies to forward-looking statements under certain circumstances, does not
apply to any of the allegedly false statements pleaded in this Complaint. The statements
alleged to be false and misleading herein all relate to then-existing facts and conditions.
In addition, to the extent certain of the statements alleged to be false may be
characterized as forward-looking, they were not adequately identified as "forward-
looking statements" when made and there were no meaningful cautionary statements
identifying important factors that could cause actual results to differ materially from
those in the purportedly forward-looking statements. Alternatively, to the extent that the
statutory safe harbor is intended to apply to any forward-looking statements pleaded

herein, defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sonus who knew that those statements were false when they were made.

## COUNT I

## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

65.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.     This Count is asserted against all defendants and is based upon Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

67.     During the Class Period, defendants, singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the other members of the Class to purchase Sonus' common stock during the Class Period at artificially inflated prices.

68.    Throughout the Class Period, Sonus acted through the Individual Defendants, whom it portrayed and represented to the financial press and public as its valid representatives. The willfulness, motive, knowledge, and recklessness of the Individual Defendants is therefore imputed to Sonus which is primarily liable for the securities law violations of the Individual Defendants.

69.    As a result of the failure to disclose material facts, the information the defendants disseminated to the investing public was materially false and misleading as set forth above, and the market price of Sonus' common stock was artificially inflated during the Class Period. In ignorance of the duty to disclose the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, Plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the common stock in purchasing Sonus' common stock. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

70.    Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

71.    By reason of the foregoing, defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) failed disclose material information; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of Sonus' common stock during the Class Period.

24

## COUNT II

## VIOLATION OF SECTION 20(a)
## OF THE EXCHANGE ACT

72.    Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

73.    The Individual Defendants, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the 1934 Act.

74.    The Individual Defendants had the power and influence and exercised the same to cause Sonus to engage in the illegal conduct and practices complained of herein.

75.    By reason of the conduct alleged in Count I of the Complaint, the Individual Defendants are liable jointly and severally and to the same extent as the Company for the aforesaid wrongful conduct, and are liable to Plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of Sonus' common stock during the Class Period.

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of defendants, together with interest thereon;

C.    Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys; and experts;

D.     Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, and

E.     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a jury trial of all issues so triable.

Date:   March 30, 2004

Respectfully submitted,

**BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**

Jeffrey C. Block (BBO # 600747)
Michael T. Matraia (BBO # 633049)
Shannon L. Hopkins (BBO # 657485)
One Liberty Square
Boston, MA 02109
(617) 542-8300

**ZWERLING, SCHACHTER & ZWERLING, LLP**
Richard A. Speirs
Shaye J. Fuchs
845 Third Avenue, Sixth Floor
New York, New York 10022
(212) 223-3900

Counsel for Plaintiff

\\Zszny01\Docs_NY\SONUS NETWORKS\Complaint.doc

## CERTIFICATION OF SAVERIO PUGLIESE

I, Saverio Pugliese, declare that:

1.  I have reviewed the complaint regarding Sonus Networks, Inc. and authorized its filing.

2.  I did not purchase any security, which is the subject of this action, at the direction of counsel for plaintiff or in order to participate in this private action.

3.  I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  My transactions in the security that is the subject of this action during the class period are as follows:

| Date | No. Shares | Transaction | Price | Total |
|------|-----------|-------------|-------|-------|
| 1/23/04 | 7,800 | Purchase | $9.37 | $73,086.00 |
| 1/23/04 | 2,200 | Purchase | $9.38 | $20,636.00 |

5.  During the three years prior to the date of this Certification, I have not sought to serve nor served as a representative party for a class in any action filed under the federal securities laws.

6.  I will not accept any payment for serving as a representative party on behalf of the class beyond our pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

\\Zxmy01\Docs_NY\SONUS NETWORKS\CERTIF.doc

I declare under penalty of perjury that the foregoing is true and correct.

March 25, 2004

Severio Pugliese